UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | No. 5:04-CR-74-KSF |
| | ) | No. 5:10-CV-7114-KSF |
| v. | ) | |
| | ) | ORDER |
| SEAN FRANCIS, | ) | |
| | ) | |
| Defendant/Movant. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

On March 31, 2010,[1] Defendant/Movant Sean Francis properly filed a pro se motion under 28 U.S.C. § 2255. *See* DE #37 (Motion); DE #39 (Motion to Amend); DE #40 (Order granting amendment). After receiving the United States's response, *see* DE #44 (Response in Opposition), and Movant's subsequent reply, *see* DE #46 (Traverse to Response), the Court determined to conduct a limited evidentiary hearing and appointed counsel. *See* DE #48 (Order). That hearing occurred on October 18, 2010, *see* DE #60 (Minute Entry), and the Court ordered post-hearing briefing as well, which the parties completed. *See* DE #64 (Memorandum in Support); DE #69 (Response Brief). The matter is ripe for evaluation.

Having considered the full record, and for the reasons here articulated, the Court **RECOMMENDS** that the District Judge **DENY** section 2255 relief as to all grounds. Additionally, the District Court should not grant a Certificate of Appealability.

---

[1] The Court calculates this date in accordance with the prison mailbox rule. *See Richard v. Ray*, 290 F.3d 810, 812-13 (6th Cir. 2002) (per curiam). Francis affirmed under penalty of perjury that he placed the Motion in the prison mailing system on March 31, 2010. *See* DE #37 at 13. Timeliness is not an issue.

# I. BACKGROUND

Francis faced charges in three cases for telephoning female college students, asking them sexually explicit questions, and threatening rape for any call to law enforcement.[2] *See* 5:03-CR-166-KSF, 5:04-CR-74-KSF, and 5:04-CR-89-KSF. Francis pled guilty to Counts 1, 2, 4, and 5 of Case Number 03-166-KSF; Counts 1-18 of Case Number 04-74-KSF; and Counts 1-7 of Case Number 04-89-KSF. *See* DE #16 (Judgment) at 1. On September 22, 2005, the District Court sentenced Francis to concurrent terms of imprisonment totaling 70 months and concurrent terms of supervised released totaling three years. *See id.* at 3-4. The Court also ordered a fine of $2900.00. *See id.* at 7.

On August 27, 2009, the United States Probation Office petitioned for a warrant based on an alleged violation of supervised release. *See* DE #22 (Petition for Warrant). According to the Petition, Francis had a pornographic movie on his digital cable box and admitted to viewing six pornographic movies. *See id.* at 1. United States Magistrate Judge James B. Todd conducted an initial appearance, at which Francis's counsel, Hon. Andrew M. Stephens, acknowledged receipt of a supplemental violation report including additional charges. *See* DE #41 (Transcript) at 3. At the final hearing, the Probation Officer described the two additions on the record:

> The second violation, your Honor, is that the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer. On August 10, 2009, United States Probation Officer Mark George asked the defendant to identify a female, Jane Doe, who he previously mentioned hurting during a sexual act. Mr. Francis would not give the supervisor the female's name and refused to discuss the matter any further.
> The third violation is that the defendant shall participate in a program for

---

[2] The Presentence Investigative Report indicates an earlier similar conviction for which Defendant also served prison time. *See* DE #40 (Sealed Presentence Investigative Report) in Case No. 5:03-CR-166-KSF.

the treatment of mental health and sexual disorders at the direction and the
discretion of the Probation Office.

On July 16, 2009, we received a letter from the treatment provider that as
a result of the defendant viewing pornography and failing to provide information
about a female he had met off the Internet to our office that his sex offender
treatment program was terminated.

*See* DE #45 (Transcript of Final Hearing) at 3. The supplemental violation report never surfaced

in the case record until the evidentiary hearing on the section 2255 motion, and at that time, the

Court learned that the USPO actually issued two supplemental reports. *See* DE #61 (Exhibit and

Witness List).

On September 4, 2009, Defendant stipulated to the violations, and the District Court

revoked and terminated the terms of Francis's supervised release. *See* DE #28 (Minute Entry for

Final Hearing). District Judge Forester entered an amended judgment, including six months

imprisonment and twelve months of supervised release. *See* DE #30 (Amended Judgment).

Defendant/Movant did not appeal.[3]

On March 31, 2010, Francis filed a motion under 28 U.S.C. § 2255 to attack the amended

judgment. *See* DE #37. Only days later, Francis moved to amend his Motion, *see* DE #39, and

Magistrate Judge Todd granted that motion and incorporated statements in the Motion to Amend

into the section 2255 Motion pending. *See* DE #40.

Francis faced (and faces) continued incarceration in the Eastern District of North

Carolina, where the United States has initiated civil commitment proceedings. *See* Case No.

---

[3] The United States has not raised procedural default as a defense in any of its filings.
Accordingly, the Court considers the defense waived. *See Cone v. Bell*, 129 S. Ct. 1769, 1791
n.6 (2009) (noting that "procedural default may be waived if it is not raised as a defense") (citing
*Banks v. Dretke*, 124 S. Ct. 1256, 1280 (2004)); *Flood v. Phillips*, 90 F. App'x 108, 114-15 (6th
Cir. 2004) (discussing waiver of procedural default as a defense and declining to raise the issue
*sua sponte*).

5:10-HC-2013-BO (E.D.N.C.). Due to the pendency of those proceedings, *see* 18 U.S.C. § 4248(a), Movant has been detained beyond his scheduled date of release under Judge Forester's Amended Judgment in the instant case. *See* DE #30. Movant properly challenged civil commitment in the Eastern District of North Carolina, and he has further moved, under 28 U.S.C. § 2241, for a writ of habeas corpus, based on a challenge to the execution of his sentence. *See* Case No. 5:10-HC-2076-BO (E.D.N.C.).

The Court ordered Francis transferred to the instant District for the October 18, 2010, limited evidentiary hearing in this section 2255 matter, *see* DE #48 (Order), and Defendant/Movant attended and participated in the hearing. *See* DE #60. After the hearing, Francis moved to be returned to the Eastern District of North Carolina so he could attend further proceedings there, *see* DE #67 (Motion to Release Francis from Writ), and the Court granted that motion. *See* DE #68 (Order). Defendant/Movant continues to be incarcerated in that District.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may seek habeas relief because a sentence violates the Constitution or federal law, the federal court lacked jurisdiction to impose such sentence, or the sentence exceeds the maximum authorized by law. *See* 28 U.S.C. § 2255. To prevail on a section 2255 motion alleging constitutional error, the Movant must establish that the error had a "substantial and injurious effect or influence on the proceedings." *Watson v. United States,* 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson,* 113 S. Ct. 1710, 1721-22 (1993)). To prevail on a motion alleging non-constitutional error, the Movant must establish a "fundamental defect which inherently results in a complete miscarriage of justice or an error so egregious that it amounts to a violation of due process." *Watson,* 165 F.3d at 488 (citing *Hill v.*

*United States,* 82 S. Ct. 468, 471 (1962)). In making a section 2255 motion, Movant bears the burden of proving his or her contentions by a preponderance of the evidence. *See McQueen v. United States*, 58 Fed. App'x 73, 76 (6th Cir. 2003) (per curiam) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence.").

The Court shall hold an evidentiary hearing unless "the files and records of the case conclusively show that the prisoner is entitled to no relief." *See* 28 U.S.C. § 2255(b). Further, "no hearing is required if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact .'" *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)).

The Court additionally recognizes the pro se status that Francis maintained through most of this action. Pro se motions receive a comparatively lenient construction by the Court. *See Castro v. United* States, 124 S. Ct. 786, 791-92 (2003) (demonstrating consideration given across the circuits for pro se petitions); *Franklin v. Rose,* 765 F.2d 82, 85 (6th Cir. 1985) (holding that "allegations of a pro se habeas petition, 'though vague and conclusory, are entitled to a liberal construction'" including "active interpretation . . . 'to encompass any allegation stating federal relief'").

## III. ANALYSIS

Francis's section 2255 Motion, as amended, asserts essentially three grounds for relief.[4]

---

[4] As a preliminary matter, the Court finds that it possesses jurisdiction to address this matter at this time. Francis has not been released from custody because the United States has filed a Certification of a Sexually Dangerous Person, pursuant to 18 U.S.C. § 4248(a), and

5

First, Movant argues that due process required pre-stipulation notice of the possibility of civil commitment proceedings. *See* DE #37 at 4. His Motion to Amend asks the Court specifically to consider the United States Supreme Court's recent holding in *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010). *See* DE #39 at 1. In that case, the Supreme Court held that petitioner Padilla's trial counsel performed deficiently by failing to advise him that a guilty plea would result in automatic deportation. *See Padilla*, 130 S. Ct. at 1483. Second, and relatedly, Francis asserts that his attorney assisted him ineffectively by failing to advise of the civil commitment risk. *See* DE #37 at 5; DE #39 at 1-2. Third, because Defendant/Movant allegedly had no knowledge of the possibility of civil commitment or was advised incorrectly about same, he claims that his Rule 32.1 hearing waiver cannot have been knowing and voluntary. *See* DE #37 at 7.

**Ground One: Due Process and Notice of Civil Commitment Possibility**

Francis frames his first challenge as founded on due process. However, he later, by amendment, asks the Court to include attention to *Padilla v. Kentucky*, which focused on ineffective assistance of counsel. To ensure attention to both dimensions of Defendant/Movant's complaint, the Court first addresses the due process theory, then turns, as a second ground for relief, to ineffective assistance of counsel.

While the deportation provisions addressed in *Padilla* prove almost automatic in many circumstances, including the one facing the petitioner in that case, the civil commitment statute,

---

initiated civil commitment proceedings. For this reason, Movant still has a term of supervised release pending. *See* 18 U.S.C. § 3624(e) ("The term of supervised release commences on the day the person is released from imprisonment . . . ."). This pending term meets the "in custody" requirement for pursuing section 2255 relief. *See Maleng v. Cook*, 109 S. Ct. 1923, 1925 (1989). Had Francis been released and concluded his term of supervised release, the Court would need to conduct an Article III case-or-controversy analysis. *See Spencer v. Kemna*, 118 S. Ct. 978, 983 (1998). Here, the pending supervised release term negates the need for this analysis.

18 U.S.C. § 4248, requires significant proof by the United States in contested proceedings. *See* 18 U.S.C. § 4248(d) (requiring "clear and convincing evidence" for commitment); *United States v. Comstock*, 130 S. Ct. 1949, 1965 (2010) (holding the statute constitutional under the Necessary and Proper Clause); *United States v. Comstock*, Nos.07-7671, 07-7672, 07-7673, 07-7674, 07-7675, 2010 WL 4925389, at *1-*3 (4th Cir. Dec. 6, 2010) (addressing the process for civil commitment, on remand from the United States Supreme Court). Under the statute, the process begins when the Attorney General, an individual authorized by him, or the Director of the Bureau of Prisons certifies a person to be sexually dangerous and transmits that certificate to the Clerk of Court in the federal district where the person is confined. *See* 18 U.S.C. § 4248(a). The certificate stays release, pending civil commitment proceedings. *See id.* Ultimately, the court holds a hearing to evaluate whether the person is a sexually dangerous person, based on clear and convincing evidence. *See* 18 U.S.C. § 4248(c), (d); *Comstock*, 2010 WL 4925389, at *2 (describing the facts that the Government must establish). Only upon such a finding by a court will civil commitment finally occur. *See* 18 U.S.C. § 4248(d). Given this procedure, the Court observes that civil commitment cannot be said automatically or certainly to occur, based on a given result in another proceeding. That is, unlike deportation, as addressed by the Supreme Court in *Padilla*, civil commitment requires significant additional proceedings.

While the Sixth Circuit has not yet addressed this issue, the First Circuit has authored a persuasive opinion in *Steele v. Murphy*, 365 F.3d 14 (1st Cir. 2004). In *Steele*, a 28 U.S.C. § 2254 petitioner argued that the Commonwealth of Massachusetts courts unreasonably applied Supreme Court precedent in finding that his trial attorney's and the Commonwealth's failure to advise that a guilty plea may lead to civil commitment fails to invalidate the plea as not knowing

and voluntary. *See Steele*, 365 F.3d at 16. The appellate court held specifically "that the possibility of commitment for life as a sexually dangerous person is a collateral consequence of pleading guilty." *See id.* at 17 (citing similar precedent from the Fourth Circuit and Eighth Circuit). This designation has importance because, under Supreme Court precedent, a trial court need only inform a defendant of the direct consequences of a plea, not any collateral consequences. *See Brady v. United States*, 90 S. Ct. 1463, 1472 (1970). *But see Padilla*, 130 S. Ct. at 1481 (noting that, in an ineffective assistance of counsel claim context, "[t]he collateral versus direct distinction is . . . ill-suited to evaluating [the] claim"). The First Circuit explained its analysis: "Rather than being labeled a sexually dangerous person as a direct result of pleading guilty to the crimes Steele committed, the Massachusetts law in effect when Steele was deemed a sexually dangerous person required many steps before a court could conclude that Steele was sexually dangerous." *See Steele*, 365 F.3d at 17; *id. at 18* (explaining that an argument Steele should have been notified of the possibility of a psychiatric evaluation would be equally unconvincing). District courts have similarly denied due process challenges to a failure to advise regarding possible civil commitment. *See, e.g.*, *Maxwell v. Larkins*, No. 4:08-CV-1896-DDN, 2010 WL 2680333, at *5-*6 (E.D. Mo. Jul. 1, 2010) (slip copy) (addressing section 2254 challenge to civil commitment under Missouri statutes); *Brown v. Goodwin*, No. 09-211(RMB), 2010 WL 1930574, at *12-*14 (D.N.J. May 11, 2010) (slip copy) (same as to New Jersey statutes and specifically distinguishing *Padilla*).

In this due process context, the direct-versus-collateral-consequences distinction has merit. *Compare Padilla*, 130 S. Ct. at 1481 (noting that, in the *Strickland* performance of counsel context, the Supreme Court has never applied a distinction between direct and collateral

consequences). By the mechanics of the civil commitment statute, as well as case law assessing same, civil commitment requires a separate proceeding, at which the United States has a substantial proof burden that the Government may well not meet. Initiating civil commitment proceedings reflects a discretionary choice made by authorized parties, such as the Attorney General or Bureau of Prisons, and effected by the filing of a certification. Here, Francis's challenge would result in the rather absurd practical effect that, in any prosecution resulting in federal custody,[5] failure to advise of the possibility of discretionary civil commitment proceedings would violate due process. Such a broad reading of due process would dilute the applicable principle. This challenge yields no section 2255 relief for Francis.

**Ground Two: Ineffective Assistance**

To establish ineffective assistance of counsel, a movant must show that his counsel's performance was deficient and prejudicial. *See Strickland v. Washington*, 104 S. Ct. 2052 (1984). First, the burden falls upon the defendant to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *See id.* at 2064. The errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *See id.* Here, the court's review of counsel's conduct is highly deferential and "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See id.* at 2065. Notably, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

---

[5] The commitment statute in theory encompasses any defendant confined federally, irrespective of the basis for confinement.

perspective at the time." *See id.*

Second, to establish prejudice, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See id.* at 2068. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *See id.* at 2066. In a guilty plea context, a movant establishes prejudice by demonstrating that, but for counsel's deficient performance, he would not have pled guilty and would have required a trial. *See Woods v. United States*, No. 07-5644, 2010 WL 3927243, at *8 (6th Cir. Sept. 23, 2010) (slip copy) (quoting *Thomas v. Foltz*, 818 F.2d 476, 480 (6th Cir. 1987)); *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009) (applying standard in the context of a conditional guilty plea). Courts can approach the *Strickland* analysis in any order, and an insufficient showing on either prong ends the inquiry. *See Strickland*, 104 S. Ct. at 2069.

On the instant record, Francis has not established deficient performance of counsel under *Strickland*. Essentially, Defendant/Movant complains that his counsel misadvised him as to the possibility of civil commitment proceedings, building on *Padilla* and the recent Eleventh Circuit case of *Bauder v. Dept. of Corrections for the State of Florida*, 619 F.3d 1272 (11th Cir. 2010). *See* DE #39; DE #64 at 2. Under this theory, in the context of *Strickland*, the affirmative misadvice would constitute deficient performance, and the possibility of being subjected to civil commitment proceedings based, in part, on the adjudicated supervised release violations would stand as the prejudice. Thus, Movant claims bad advice induced his stipulation.

However, in the instant case, the record reflects no affirmative misadvice and instead indicates considerable attention paid to crafting a strategy specifically with respect to avoiding

civil commitment, if possible. In an extended exchange with current counsel for Francis, quoted here because of its centrality, Stephens described his strategy for the supervised release proceedings, as well as his personal view on the civil commitment statute, based on discussions with Francis:

Q. Then specifically regarding the issue of civil commitment, and maybe you answered this. But more specifically, what – what did you advise him on the issue of civil commitment?

A. I told him, clearly, that we did not need to get into the issue of a hearing on the underlying basis of the violation; that is, the questions and the answers to the lie detector exam. He knew what questions had been asked, he knew what the answers there had been, and he knew that he had answered truthfully. And Sean and I were trying to do everything possible to keep this very event from occurring.

Q. And so then, if I understand your response, it is this strategy that you've identified for the Court, this strategy was your response or was your advice regarding the possibility of civil commitment?

A. Clearly. And -- and -- and I will tell you this: In conversations that we had after his six months started and he's in the process of being designated, he told me on a phone conversation he had been designated, I think, to a prison in South Carolina, and that we thought we had gotten away with this, if you will. And then he gets detoured to Butner and gets out at Butner.
        He called me from Butner, and at that point I started doing other things to be a little more aggressive in trying to stop the BOP from designating him, because at that point I was pretty sure we failed.

Q. And all those things you identified were post- --

A. Post-stipulation.

Q. Yes, post-hearing. Did you explain to Mr. Francis that the length of the civil commitment is possibly for life?

A. Absolutely.

Q. Now, at the time you had these discussions with him prior to the supervised release revocation hearing, you were, I would think, aware of Sean's criminal

history?

A. Yes, sir.

Q. And you were aware of the underlying allegations in the supervised release revocation case?

A. Yes, sir.

Q. Okay. Based on that, and anything else you knew about the case, did you believe that -- that 18 U.S.C. 4248 actually applied to Sean?

A. I don't think that statute should apply to any human being. Specifically, the facts of his case do not merit a finding, in my humble opinion, of Sean Francis being a sexually dangerous person. That having been said, was I worried about it? Yes, I was.

Q. I guess, cutting to the chase -- and Mr. Francis can speak for himself. But I think his testimony would be that he recalls that you told him on more than one occasion, on several occasions, that you did not think that he would be a sexually dangerous person under 4248. Do you agree with that characterization?

A. I have to agree with you that I told him I did not think that his underlying offenses qualified him as a sexually dangerous person, yes.

Q. Okay.

A. And I will say this: That I was concerned that, were the lie detector questions and answers publicized, that advice might change.

Q. Regarding the -- regarding the actual hearing before Judge Forester on 7/4/09 –

A. Yes, sir.

Q. -- you would agree with me that the possibility of civil commitment was not mentioned anywhere during that hearing?

A. I would have been shocked had it been mentioned.

Q. So you would agree with me?

A. Yes, sir.

Q. All right. And is it unusual, in your mind, that if Sean was aware that, as

you've indicated, that this -- that this possibility of civil commitment is out there, that he would still enter the stipulations to these violations as opposed to proceeding to a hearing?

A. No, because you're not entitled to a trial. A supervised release violation hearing is a far lesser standard, I think, than reasonable doubt. And in fact, my strategy was completely and totally designed to not have a hearing. I did not want the trial court to know about the lie detector exam.

I was getting a six-month under-guideline sentence, I was chopping off time on the far end of supervised release, and there was absolutely no reason to do anything other than enter that stipulation.

And, you know, he had signed the conditions -- because frankly he didn't have any choice but to sign the conditions – not to possess pornography and to take the lie detector. If he doesn't sign those conditions, then his supervising officer brings him back for whatever reason they made him modify the terms. I don't know what those were.

But once you sign the conditions, it's not a great deal of effort on Mr. McBride's part to prove that to the level that would meet that necessary for a revocation. And if I can get a guy six months and chop his time down, as opposed to 12 to 18, and save at the same time the risk of educating the trial court as to the specifics of the violation, I think I was doing due diligence.

Q. If you knew -- and I guess this is a hindsight question. If you knew on September 4, '09, what you know today, and that is that the certification was actually filed, would your advice to Mr. Francis have been different?

A. Let me answer that by saying, probably, yes. But if I had known that that stipulation would wind him up in a civil commitment, I would have gone to Bob McBride and I would have literally and figuratively put on my kneepads to try to figure out some way around a stipulation that would have minimized the risk to this gentleman being civilly committed.

I have to say, since you asked the question, I find the civil commitment statute maybe the worst piece of legislation that's ever come out of the Congress of the United States. I think Sean Francis has done his time. I think Sean Francis, if he acts out, should reoffend, should be resentenced. But there is no possible way he should be civilly committed.

Would my advice change if I knew that? I'm not sure what I could do, other than try to make another deal with Mr. McBride, because once the probation officer pulls the trigger on a supervised release violation it's going to get to the Judge. It's ultimately going to get to Judge Forester.

I wonder if I might not have gone to the Judge with Mr. McBride to say, "Look, maybe this guy needs six months for possessing pornography and passing a lie detector test, but he sure doesn't need a lifetime commitment with no due process whatsoever under 4248."

In all this, no matter whatever happens to this, I can't sign off on anything that would get this guy or anybody else civilly committed under these facts.

Q. And "under these facts," you mean the facts of this case?

A. Yes, sir.

Q. All right. Well, I know I have spoken with you once on the phone.

A. Absolutely.

Q. And I assume that maybe Mr. McBride or someone from the government has spoken with you –

A. Mr. McBride has.

Q. -- on an occasion or two in preparation for the hearing here today?

A. Yes, sir.

Q. So I know you have had time to kind of reflect –

A. I have.

Q. -- on the case.

Having reflected on the matter, do you think there was any misadvice, or maybe even more broadly miscommunication, between you and Mr. Francis on this issue of civil commitment in any – in any form?

A. Honestly, no, because there is so little that can be done. We talked about it. He was scared to death of it, because he had been within the belly of the beast that is the BOP on that first go-around.

If I had made other decisions, the result could have been worse in terms of his short-term incarceration. Would it have gotten us to the same place that we are now? Perhaps.

At the time, that strategy seemed sound. I will tell you that Bob and I -- Bob McBride and I actually had a conversation where, you know, I said, "If he's going to reoffend, he's going to reoffend. We don't need to be doing this."

Bob and I talked about civil commitment. I talked about it to everybody, because we were -- we were concerned about it; yes, sir.

I wish I had done something differently. I don't know what it would have been. I don't ever want a man to sit in his chair.

*See* DE #62 (Transcript) ("Tr.") at 9 lns. 12-25; p. 10-14; p. 15 lns 1-19. Here, the extended

excerpt illustrates what appears really to have occurred in this matter. Stephens's performance in

the matter stands as objectively reasonable because he accurately identified and discussed the possible civil commitment with Francis, formed a strategy to avoid creating a detailed record in the supervised release proceedings while simultaneously securing a favorable sentence,[6] and executed that strategy effectively. Stephens's personal passion concerning the civil commitment statute should not have confused Defendant/Movant, even superficially, and led to a misunderstanding.[7] The record persuasively documents that, alongside passionate opposition to the civil commitment statute, Stephens provided accurate advice – that the commitment statute may apply. In fact, and most persuasive to the Court, **the entire strategy devised by Stephens for the supervised release proceedings centered on the possibility that civil commitment would apply**. Given this strategy, as executed successfully, the Court cannot find that Stephens misadvised Francis about the possibility of civil commitment. Accordingly, Defendant/Movant has not shown deficient performance of counsel.

The Court notes that Francis's theory morphed slightly as a result of the hearing. Originally, he focused primarily in briefing on counsel's alleged failure to advise about the

---

[6] The record suggests that, contrary to Stephens's recollection, Francis did not receive a below-guidelines sentence. He faced a 6-12 month range (a Criminal History category of IV and Grade C violation). Nonetheless, the deal ended supervision at 12 months, well below the 30-month maximum remainder, and resulted in incarceration at the bottom of the range.

[7] An exemplar of this passion is Stephens's rather blunt response to the United States when the Government requested an affidavit in support of its defense against Francis's section 2255 motion. *See* DE #63-1 (Letter). Stephens begins, "Please be advised that I have seen Mr. Francis's 2255 Petition and quite frankly am in complete agreement with it." *See id.* at 1. A reader could inaccurately wrench this single statement out of context and assert Stephens to be agreeing he performed ineffectively for Francis, but the context of the letter shows Stephens's real point to be opposition to the civil commitment statute. *See, e.g.*, *id.* ("I am inclined to give testimony [for Francis] . . . as I believe his continued incarceration is violative of every single Constitutional Right he currently thought that he had.").

possibility of commitment. *See* DE #37 at 4-6. The hearing addressed advice, and attorney

Stephens provided the only testimony on the topic.[8] The Court finds that Stephens did advise

Francis about the civil commitment possibility.[9] The record would permit no other conclusion.

*See, e.g.*, Tr. at 7, 9, 10, 49, 53, & 54 (testifying that Francis "absolutely" knew of the

commitment risk). Thus, post-hearing, the focus became misadvice instead of nonadvice. Francis

claims that Stephens's prediction that he would not ultimately face commitment amounts to

misdavice and ineffective assistance.

The Sixth Circuit does recognize gross misadvice as a possible avenue for *Strickland*-

based relief in some contexts. *See, e.g.*, *Sparks v. Sowders*, 852 F.2d 882, 885 (6th Cir. 1988)

(holding that "gross misadvice concerning parole eligibility can amount to ineffective assistance

of counsel"). While *Padilla* abrogated any reading of *Sparks* to restrict *Strickland* relief to

affirmative misadvice, *see Padilla*, 130 S. Ct. at 1484, the holding that gross misadvice can

situationally amount to ineffective assistance of counsel remains good law. *See Sparks*, 852 F.2d

at 885. Whether this would apply to commitment advice is not clear, and the Court need not

---

[8] Francis also presented testimony from his mother, who averred to notes of a telephone call with Stephens where the attorney purportedly said he had provided "bad counsel" to Defendant/Movant. *See* Tr. 61 at lns. 9-22. However, this evidence fails to impact the Court's analysis significantly because the context in which Stephens made the comment remains ill-defined. At the evidentiary hearing, the Court heard sworn testimony from Stephens about the key issues, and such sworn testimony carries much more substantial weight than a hearsay statement from a note made from a conversation. Habeas almost always features some flavor of "bad counsel," and the Court does not credit that Stephens ever characterized his assistance as ineffective.

[9] Even if *Padilla* applies, then Stephens met the standard. Under *Padilla*, an unclear deportation possibility requires only apprisal that a plea "may" carry a deportation risk. *See Padilla*, 130 S. Ct. at 1483. Here, with the indeterminacy of civil commitment, Stephens would at most owe this duty.

resolve that issue. The Court finds that Stephens did not misadvise Francis. His opinion is that Francis should not face commitment. *See* Tr. 17 at lns. 1-15. However, the risk lies in the resolution of that ultimate question, something Francis plainly knew and understood.[10] Indeed, the issue remains undefined, and the answer to commitment lies in a judicial decision at the conclusion of a process. That Stephens stated his belief about the merits of commitment hardly qualifies as misadvice and a fortiori is not gross misadvice.

Francis likewise has not established prejudice under the *Strickland* analysis. While Defendant/Movant asserts that he would not have stipulated to the violations, had he known that civil commitment may result, the record in this matter belies the assertion. Instead, the record reflects that Stephens and Francis conferred about the possibility of civil commitment and their supervised release violation defense strategy emphasized an effort to avoid creating any further record that might induce civil commitment. No doubt Francis may regret not challenging the violations, given that he ended up being subject to civil commitment proceedings anyway, but this regret cannot establish prejudice. Francis knew he may face civil commitment, and he elected to stipulate to the violations anyway, with hope that the abridged stipulation may allow him to escape the commitment prosecution. On this record, he has not proven prejudice.

Additionally, the record indicates that Defendant admitted to one of the violations (related to pornography) and he had undoubtedly been terminated from treatment. *See* DE#22 at 1; DE #61 Exhibits. Thus, and notwithstanding Francis's brief-based suggestions of conditional

---

[10] Indeed, Francis faced comparable evaluation previously, as shown by his request for counsel during the primary confinement period under Judge Forester's original judgment. *See* DE #14 (Motion/Letter to Appoint Counsel); DE #15 (Letter/Motion to Appoint Counsel) in Case No. 5:04-CR-89-KSF (reflecting Francis's concern about possible civil commitment proceedings).

unconstitutionality, the record supporting a violation finding is quite strong. In the Rule 32.1 context, Francis has not persuaded the Court he would have acted differently if Stephens had advised him differently.

With neither deficient performance nor prejudice established, Francis has not proven ineffective assistance under *Strickland*. This ground yields no section 2255 relief.

**Ground Three: Waiver Not Knowing and Voluntary**

This ground for relief has, essentially, two components. First, Francis argues that, because he had not been advised of the possibility of civil commitment, his waiver of a revocation hearing – that is, his entry of a stipulation to the allegations – cannot have been knowing and voluntary. *See* DE #37 at 7. This contention squares exactly with the argument that the First Circuit rejected, as noted above, in *Steele v. Murphy*. While that case proceeded in a section 2254 context, the instant section 2255 posture, with the specific facts in this record, yields no different conclusion. In particular, since Stephens's and Francis's strategy to defend against the supervised release allegations focused substantially on avoiding the creation of a record to support civil commitment prosecution, Defendant/Movant can hardly suggest that he waived his right to a hearing and stipulated to the violations without having been advised of the possibility of civil commitment. The record simply and unequivocally belies such a contention.

The second component of this ground for relief takes the tack that the final revocation proceeding, where Francis waived the hearing and entered the stipulation, failed to comply with Federal Rule of Criminal Procedure 32.1, so the waiver could not have been knowing, voluntary,

and intelligent, even with knowledge of the possibility of civil commitment.[11] *See* DE #64 at 6-7.

The instant case falls directly between the factual circumstances of the two cases the parties argue should apply: *United States v. Williams*, 321 F. App'x 486 (6th Cir. 2009), and *United States v. Gibbs*, 228 F. App'x 639 (9th Cir. 2006). In *Williams*, advocated by the United States and distinguished by Francis, the Sixth Circuit affirmed a District Court's acceptance of a waiver of his right to a supervised release hearing, where that court failed to follow Federal Rule of Criminal Procedure 32.1 to the letter. *See Williams*, 321 F. App'x at 490-91. Significantly, the court's discussion with Williams emphasized the hearing right and how the waiver would operate. *See id.* at 489 (providing partial transcript of exchange). The discussion included:

> THE COURT: All right. Do you understand that normally you would have a right to a hearing in connection with these charged violations, at which the government would have to present proof of the violations?
>
> THE DEFENDANT: I understand now.
>
> THE COURT: All right. And so do you understand that by admitting to the

---

[11] At the evidentiary hearing, the United States objected to this line of questioning as outside the scope of the hearing. *See, e.g.*, DE #62 at 34 lns. 13-17. On brief, the Government notes that this contention had potentially not been raised in the original section 2255 motion, *see* DE #69 at 9, but the United States raises no timeliness objection. The general Rule 32.1 allegation, if not raised in the original section 2255 motion, came, by the Court's calculation, more than a month beyond the AEDPA statute of limitations. Absent an explicit waiver of the statute of limitations by the United States – a waiver that does not exist here – the Court could raise the issue of timeliness *sua sponte*, order Francis to show cause for the timeliness problem, and permit him to submit any evidence either contradicting this Court's timeliness calculations or supporting equitable tolling. *See Day v. McDonough*, 126 S. Ct. 1675, 1684 (2006). Here, in its discretion, the Court chooses to address the ground on its merits. Importantly, Francis proceeded pro se when he filed his section 2255 motion, and even so, he contested the knowing and voluntary nature of the stipulation. The proper analysis of such an allegation focuses on the totality of the circumstances, so even if Defendant/Movant only intended to focus on the lack of advice concerning civil commitment, the totality would still be in view as to the knowing and voluntary nature of the plea. The Court determines that this broad analytic calculus here necessarily includes the Rule 32.1 allegation.

violations you are waiving your right to a hearing on them?

(The defendant spoke with counsel off the record.)

THE DEFENDANT: Yes.

THE COURT: And is that what you want to do?

THE DEFENDANT: Yeah.

*Id.* There, the judge confirmed Williams's understanding of his right to a hearing and the effect of a stipulation. Having indicated awareness and understanding, Williams elected still to stipulate to the charges.

In *Gibbs*, the Ninth Circuit reversed a District Court, holding that Gibbs's admission to a supervised release violation had not been knowing, voluntary, and intelligent. *See Gibbs*, 228 F. App'x at 639. *Gibbs* included no excerpts from the supervised release hearing transcript, but instead characterizes that hearing as follows:

> However, there is nothing in this record to indicate that Gibbs knew about his rights, much less that he made a voluntary and intelligent waiver of them. We cannot presume that he did when we are faced with a silent record. The defect is structural because the whole framework of the proceeding was too rickety where Gibbs had no knowledge of his right to present witnesses and to confront those against him.

*See id.* at 639-40. In *Gibbs*, unlike *Williams*, the record reflected no evidence of any knowledge of rights or the effect of a waiver. On such a record, the Ninth Circuit could not conclude any waiver to be knowing, voluntary, and intelligent.

The record in the instant case proves different still. At the final revocation hearing, District Judge Forester discussed the stipulation with Stephens and briefly with Francis, in relevant part, as follows:

THE COURT: Mr. Stephens, does Mr. Francis admit or deny the violations?

MR. STEPHENS: If your Honor please, he admits the original violation and understands the other two violations and would concede that if the United States had testimony consistent with what the probation officer said that it would be a violation, so we're ready to stipulate that. And we have done some negotiation and I think we have a recommendation, if the Court would consider.

THE COURT: All right. So then the Court would find that Mr. Francis has violated each of the conditions set out in Violations 1, 2, and 3?

MR. STEPHENS: Yes, sir.

THE COURT: All right.

MR. MCBRIDE: Your Honor, Mr. Stephens, Probation, and the United States have negotiated a recommendation for the Court, which would be six months of incarceration with 12 months of supervision to follow, and all the conditions that were previously in place to be continued, your Honor.

THE COURT: Mr. Rapier, how does that sound to you, sir?

PROBATION OFFICER: Your Honor, we were involved in the negotiation process, so we would agree.

THE COURT: All right.

MR. STEPHENS: As do we. And there are concessions on both sides, for reasons that are legitimate.

THE COURT: All right. And Mr. Francis, is this satisfactory with you?

THE DEFENDANT: Yes, your Honor, it is.

THE COURT: It will be the judgment of the Court, then, Mr. Francis, that you be committed to the custody of the Bureau of Prisons for a period of six months, that you will have 12 months remaining of supervision -- 12 months of supervision remaining, and all conditions, existing conditions, will remain in effect.

MR. STEPHENS: Thank you, sir.

*See* DE #45 at 3 lns. 22-25; 4; 5 lns. 1-6. This discussion omits reference to the Rule 32.1 rights.

Notably, however, District Judge Forester ensured, through counsel and one direct question to

Defendant/Movant, that Francis understood he would be stipulating to all three violations and

that he had knowledge of the penalties in the agreement negotiated and proffered to the District Court. Francis, per his response, agreed with the representations of his counsel.

The record in the instant case also includes supplemental information about Francis's knowledge. At the evidentiary hearing in this matter, Francis's presently appointed counsel, Hon. Willis Coffey, asked Stephens his recollection of the Rule 32.1 requirements. Their exchange included:

> Q. What I want to do is review the subparts of Rule 32.1 with you and find out what you recall regarding the information given to Sean Francis. And please keep in mind, now, what I'm not asking you here is what was said or was not said at the revocation hearing, because we have a transcript of that. Okay?
>
> A. Okay.
>
> Q. All right. So under Section 2(a), the first part is that the defendant or person is entitled to written notice of the alleged violations. Did Sean Francis receive written -- actually, a copy? Did he receive written notice of the alleged violations?
>
> . . . .
>
> THE WITNESS: I certainly did. I would presume that the probation officer served it on him. I don't know that for absolute certain.
>
> Q. Okay.
>
> A. I do know that he and I went through it, but I'm not going to say that he was served written notice. I certainly was.
>
> Q. Okay. And I guess specifically my question -- and just what you recall, that's what this question is. Do you recall furnishing him a copy of the alleged violations?
>
> A. That would be my practice.
>
> Q. But do you remember doing that in this case?
>
> A. No, I can't say that, either.

Q. All right. Then going on to (b), was the evidence against Mr. Francis disclosed to him?

A. It was.

Q. And how would that have been done?

A. I had conversations with the supervising PO. I read the notes and the letter that the probation officer prepared. I'm virtually certain that I saw a list of the questions that were asked. And that would be based on my conversations with both the PO and with Mr. McBride.

Q. Okay.

A. And my own client.

Q. All right. Down to Section 2(c), an opportunity to appear, obviously, at the hearing. So he was present, correct?

A. Yes, sir; he was.

Q. All right. Now, was he -- did you disclose to him that he had the right to present evidence at that hearing?

A. Yes.

Q. Did you disclose to him that he had the right to question any adverse witnesses called at the hearing?

A. Yes.

Q. Did you disclose to him, moving on to (d), that he had the right to retain counsel?

A. No.

Q. Okay. And obviously, you were appointed counsel?

A. I was. And I'll be very honest with you. After I got the appointment, I did not say a word to him about his right to hire counsel. I will tell you that during the pendency of all of it his parents offered to pay me, and I declined.

Q. Okay. All right. And did you, moving on to (e), then, did you make him aware that he had an opportunity to make a statement at the hearing?

A. I did, and I strongly urged against it.

Q. All right. And did you advise him that he had the right to present any information in mitigation?

A. Yes, and that was in the form of the offer and compromise that Mr. McBride and Rocky and I worked out.

Tr. at 34 lns. 2-12, 23-25; 35; 36 lns. 1-21. Here, then, Stephens confirmed Francis's knowledge of the core Rule 32.1 requirements.

Rule 32.1 requires no formal colloquy, and the Court assesses the validity of a hearing waiver on the "totality of the circumstances." *See Williams*, 321 Fed. App'x at 490. The totality on this record includes Stephens's unrebutted testimony, which indicates detailed discussions between counsel and client signifying Francis's comprehension of Rule 32.1 and available process. *See United States v. Hodges*, 460 F.3d 646, 652 (5th Cir. 2006) (noting "[t]he totality of the circumstances means exactly that – all the circumstances should be considered.") (quoting *United States v. Correa-Torres*, 326 F.3d 18, 23 (1st Cir. 2003)). The Court finds that based on a complete record, Francis made the hearing waiver in a knowing, voluntary, and intelligent way.[12]

This record documents the knowing nature of the waiver and stipulations. Additionally, Stephens's testimony about the Rule 32.1 requirements documents that Francis's waiver and stipulations should stand as intelligent because he had knowledge of the charges against him, the possible penalties, his right to a hearing including his ability to present evidence and confront

---

[12] This was not Francis's first trip through Rule 32.1. The Southern District of New York revoked supervised release under his prior federal conviction for making threatening interstate communications. *See* DE #40 at ¶ 218 in Case No. 5:03-CR-166-KSF.

witnesses, and his right to counsel. *See* DE #62 at 34 lns. 2-12, 23-25; 35; 36 lns. 1-21. Francis never indicated any objection to Stephens's representations to the District Court. *See United States v. Farrell*, 393 F.3d 498, 500 (4th Cir. 2005) (finding significant that a supervised release defendant never objected to his counsel's representations at a hearing) (citing *United States v. Tapia-Escalera*, 356 F.3d 181, 184 (1st Cir. 2004) for the same premise). The lack of opposition establishes the voluntary nature of the waiver and stipulations.

In this section 2255 posture, where Francis has the burden of proving his contentions by a preponderance of the evidence, his Rule 32.1 defect contention merits no relief.

## IV. CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000); *see Miller-El v. Cockrell*, 123 S. Ct. 1029, 1039-40 (2003) (discussing development of standard). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. 28 U.S.C. § 2253(c)(3); *see Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). For dismissals on procedural grounds, as to when a Certificate of Appealability should issue, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *See Slack*, 120 S. Ct. at 1604.

The Court recommends, for the reasons stated below, no Certificate of Appealability issue. First, no reasonable jurists would find the Court's conclusions about due process or ineffective assistance of counsel to be debatable or wrong. Due process does not reasonably require notice of a wholly discretionary collateral possibility that would require a separate prosecution under a significant proof standard. The civil commitment process differs substantially from the automatic deportation circumstance addressed by the Supreme Court in *Padilla*. Further, Stephens effectively represented Francis, factually and legally. Finally, while the original hearing record does not establish Rule 32.1 mechanics, the totality of the evidence, including the section 2255 hearing, shows Francis well knew his rights and options before stipulating.

## V. RECOMMENDATION

For the reasons discussed above, the Court **RECOMMENDS** that the District Court **DENY** Movant's motion for section 2255 relief as to all grounds. The Court also recommends that the District Court **DENY** a Certificate of Appealability.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. *See also* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 8(b). Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 106 S. Ct. 466 (1985); *United States v. Walters*, 638

26

F.2d 947, 950 (6th Cir. 1981).

     This the 30th day of December, 2010.

Signed By:

Robert E. Wier

United States Magistrate Judge